■ BANK HAPOALIM B.M. et al., Appellants, et al., Plaintiffs, v WESTLB AG et al., Respondents. [995 NYS2d 6]—

Order, Supreme Court, New York County (Shirley Werner Kornreich, J.), entered September 24, 2012, which granted defendants' motion to dismiss the complaint, unanimously affirmed, without costs.

Plaintiffs, investors in a structured investment vehicle (SIV), are the holders of "income notes" issued by two SIVs, Harrier Finance Limited and Harrier Finance (US) Limited (collectively, Harrier) and Kestrel Funding p.l.c. and Kestrel Funding (US) LLC (collectively, Kestrel).[1] Defendant WestLB AG, New York Branch (WestLB AG) is incorporated under the laws of Germany.[2] WestLB Asset Management (US) LLC (West AM), organized under the laws of Delaware, is a wholly-owned subsidiary of WestLB AG. Defendant Brightwater Capital Management (Brightwater) (together with WestLB AG and West AM, WestLB) is a wholly-owned subsidiary of WestLB AG, and a division of West AM.

An SIV is a special purpose entity that raises short-term funds

---

**1.** Plaintiff Bank Hapoalim B.M. has not filed a brief in connection with this appeal; it has advised the court that it adopts the arguments set forth in the brief of plaintiff Justinian Capital SPC, for and on behalf of Harrier Segregated Portfolio, Harrier II Segregated Portfolio, Harrier III Segregated Portfolio, Harrier IV Segregated Portfolio, and the Harrier V Segregated Portfolio.

**2.** WestLB AG New York Branch is actually a wholly-owned subsidiary of WestLB AG, but for United States law purposes, it is treated as an office of WestLB AG.

and invests them in longer-term assets. It borrows money by issuing short- and medium-term debt, and then uses that money to finance the purchase of longer-term assets, including mortgage bonds and other asset-backed securities. The SIV then seeks to earn a profit or "spread" between the interest rate at which it borrows and the interest rate it generates on the assets.

The SIVs here at issue were Harrier and Kestrel. For their long-term investments, Harrier and Kestrel bought mainly residential mortgage-backed securities (RMBS) backed by United States residential mortgages, including a substantial percentage of subprime mortgages. Harrier and Kestrel borrowed money by selling short term commercial paper (CP), and using this money from those sales to buy illiquid, long term assets—mainly RMBS backed by United States residential mortgages, including a substantial percentage of subprime mortgages.

The SIVs' funding model carries with it two corollaries. First, because the money borrowed from the initial wave of CP buyers is wrapped up in illiquid long term assets—that is, the RMBS—the only liquid source of funds to repay the maturing CP (short-term) is new CP investment. Thus, as the CP matures each month or every few months, the SIVs must sell new CP. The SIV then uses the proceeds of the new CP to pay back the principal of the prior CP—a process called "rolling" the CP. This process renders an SIV vulnerable to disruption in the CP market. If the CP market substantially slows, the SIV cannot roll the CP and it must liquidate its assets to pay back the outstanding CP. That liquidation would bring about the SIV's collapse.

Second, to maximize the spread between the long and short term interest rates, the SIV must pay a relatively low interest rate on the CP. In order to do that, the CP must be low risk—that is, it must have a very high credit rating from the rating agencies. Accordingly, the SIV is usually required to have a cushion of capital that is subordinated to the CP. To create this capital, an SIV typically has various classes of notes that it issues. These subordinated notes receive a higher return than CP; in exchange, it is agreed that any proceeds from the SIV's assets go first to repay the CP, and only when the obligations to the CP holders are fully satisfied does the cash flow down to the subordinated notes. These notes create "subordination," a cushion of capital, that protects the CP from initial losses in the SIV. Because of this subordination, the CP is able to obtain top credit ratings. In contrast, the subordinated notes have either low ratings, or often are unrated. An offshore corporation (the

issuer) issues the CP and the subordinated notes, and a United States affiliate (the co-issuer) issues the CP and subordinated notes for United States sales. The offshore corporation then holds the assets. As long as the CP rolls, and returns on the RMBS are higher than the interest rate on the highly rated CP, everyone should make a return, and the CP investors should timely be repaid upon maturity.

Unlike a bond trust or a regular corporation, an SIV is run largely by its asset manager. The investors' rights, in turn, are typically laid out in a Sale and Purchase Agreement (SPA), which functions much like the indenture in a bond. The SPA and related documents generally provide for various "triggers" that will bring about "enforcement" or "receivership"—that is, if certain conditions occur, a receiver, generally appointed and contracted with at the launch of the SIV, takes control. While they are not generally required to liquidate the assets of the SIV, the receivers have this power.

These triggers and the receivership structure they commence protect investors by taking the assets out of the control of the manager, on whose watch the heavy losses tipping the triggers were sustained. Often, the receivers liquidate the holdings, capturing whatever value remains for distribution to the investors.

In the Harrier and Kestrel SIVs, WestLB AG was the sponsor, and originally, it was also the asset manager. It assigned its role as manager to West AM, and in turn, West AM delegated the role to Brightwater. Under the terms of the asset management agreement, however, WestLB AG remained liable for all acts of the new manager.

The SPA included various triggers, including a minimum capital test. This test was based on the net asset value (NAV) of the SIV's portfolio. As the assets of the SIV decreased in value, those losses hit the subordinated notes first. Thus, as the losses wiped out the subordinated notes, there was less and less subordination insulating the CP from losses. As a result, the CP would lose its top rating, and the SIV could collapse. Failure to redeem the CP as it matured constituted another trigger in Harrier and Kestrel; the failure to redeem it indicated that the CP could not be rolled, and therefore, that the SIV was in serious danger of collapse. If either of these events took place, the receivership would begin.

Plaintiffs are banks that are the holders of hundreds of millions of dollars in subordinated notes. These notes were called "Income Notes," because in addition to a fixed coupon, they

also had a feature that allowed them to participate in the gains and losses of the SIV.[3]

According to the amended complaint, Harrier and Kestrel began hitting triggers for receivership in or about May 2007. However, plaintiffs allege, some or all of the WestLB entities, worried about the bank's reputation, concealed the de facto collapse of the SIVs through a series of frauds.[4]

The first fraud alleged is that the drop in NAV in May 2007 breached the minimum capital test and therefore required WestLB to notify the security trustee and begin receivership. However, WestLB allegedly concealed this drop in NAV and did not notify the trustee. In October 2007, the NAV again allegedly dropped, causing a breach of the minimum capital test. WestLB allegedly once again concealed this event and did not notify the trustee. Plaintiffs further allege that WestLB purported to amend the SPA to eliminate the minimum capital test, but did so without 100 percent consent of the note holders.

Finally, plaintiffs allege, WestLB AG, which was a substantial holder of CP of the two SIVs, transferred its CP and other notes in the SIVs to an entity it created—defendant Phoenix Light SF Limited. After the transfer to Phoenix, WestLB allegedly caused Phoenix to enter into an agreement that would allow the SIVs to pay off any maturing paper not with cash, but with a "pro rata" percentage of the SIVs' assets equal to the percentage of outstanding CP held by Phoenix. Plaintiffs state that the purpose of the Phoenix transaction was to conceal the fact that the SIVs could not redeem the maturing CP held by WestLB AG. Because the failure to redeem maturing CP was another trigger for receivership, the Phoenix transaction, plaintiffs allege, further forestalled receivership.

According to the allegations in the complaint, the effect of these actions was to fraudulently prop up the SIVs until 2009. Plaintiffs allege that, absent the fraud, the SIVs would have been placed into receivership in May 2007, when the receiver could have liquidated their asset for a reasonable price that would have provided a recovery for Income Note holders. Instead, plaintiffs assert, by repeatedly delaying enforcement, defendants pushed the liquidation to a point where the assets yielded no recovery for the Income Notes, which were low down in the capital structure.

---

**3.** While not relevant on this appeal, plaintiff Justinian Capital SPC obtained a number of its Income Notes after the fact, by assignment. For purposes of this appeal (and the decision below) it is assumed that both plaintiffs had standing to assert whatever tort claims the original purchasers of the notes had.

**4.** Plaintiffs never state exactly which entity was allegedly responsible.

On their motion to dismiss, defendants asserted that the action was derivative, not direct. Thus, they concluded, plaintiffs lacked standing and had failed to comply with making a demand on the board of the SIVs before bringing suit. Defendants also attacked the fraud claims, contending, among other things, that damages were merely speculative.

To begin, on this appeal, plaintiffs are judicially estopped from asserting their position on choice of law, as they consistently argued to the motion court that New York law governed the case and that their arguments relied on New York law (*Dennis' Natural Mini-Meals v 91 Fifth Ave. Corp.*, 209 AD2d 262, 262-263 [1st Dept 1994]). A party may not adopt a position on appeal at odds with its arguments to the trial court (*see id.*; *see also Nestor v Britt*, 270 AD2d 192, 193 [1st Dept 2000]), and plaintiffs cite no law to the contrary.

Similarly, plaintiffs are judicially estopped from arguing that the Income Notes should be treated as debt, since they argued repeatedly to the motion court that the Income Notes should be treated as equity. Indeed, plaintiffs concede that they previously argued in favor of the proposition that the notes were equity, but now assert that they may argue that the Income Notes are equity for some purposes and debt for others (*Nestor*, 270 AD2d at 193).

With respect to the fraud-based claims, the complaint does, in fact, plead the reliance element of the fraud claims with the requisite particularity (*see Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486 [2008]). However, the motion court nonetheless properly dismissed the fraud-based claims because the complaint is fatally defective as to the damages and causation elements (*see Starr Found. v American Intl. Group, Inc.*, 76 AD3d 25, 27-28 [1st Dept 2010]). This case is essentially a "holder" fraud case—that is, the alleged fraud is that the structured investment vehicles held their assets instead of liquidating them. As a result, plaintiffs suffered no out-of-pocket loss (*see id.* at 28). Moreover, since plaintiffs' case depends on an attenuated chain of events and series of hypothetical transactions, they have not pleaded the causation element with sufficient particularity (*see id.* at 29-30).

We have considered the parties' remaining arguments and find them unavailing. Concur—Acosta, J.P., Saxe, Moskowitz and Feinman, JJ.