MBIA Insurance Corporation, Plaintiff,

against
Credit Suisse Securities (USA) LLC, DLJ Mortgage Capital, Inc., and Select Portfolio Servicing, Inc., Defendants.


603751/2009

For Plaintiff:
Patterson Belknap Webb & Tyler LLP and Kasowitz, Benson, Torres & Friedman LLP
For Defendants:
Orrick Herrington & Sutcliffe LLP


Shirley Werner Kornreich, J.

Motion sequence numbers 036, 037, and 039 are consolidated for disposition.
Plaintiff MBIA Insurance Corporation (MBIA) and the remaining defendants,[FN1]
 Credit Suisse Securities (USA) LLC (CSS) and DLJ Mortgage Capital, Inc. (DLJ) (collectively, Credit Suisse), each move, pursuant to CPLR 3212, for partial summary judgment. Seq. 036 & 037. After the motions were fully submitted, MBIA moved by order to show cause to supplement the record with a January 18, 2017 settlement agreement between Credit Suisse and the United States Department of Justice (DOJ); Credit Suisse opposes the motion. Seq. 039. For the reasons that follow, the parties' summary judgment motions are granted in part and denied in part and MBIA's motion to supplement the record is denied.
I. Factual Background & Procedural History
On December 14, 2009, MBIA, a monoline insurance company, commenced this action by filing a complaint (Dkt. 2) alleging breaches of representations and warranties in the contracts governing a residential mortgage backed securities (RMBS)[FN2]
 transaction, Home Equity Mortgage Trust Series 2007-2 (the Transaction), which closed on April 30, 2007. MBIA also alleges it [*2]was fraudulently induced to provide financial guaranty insurance for the Transaction, pursuant to which MBIA unconditionally and irrevocably guaranteed payment of principal and interest to the Transaction's certificateholders. The Transaction securitized second lien, Alt-A, non-prime loans.[FN3]
 The extreme riskiness of this collateral, along with the fact that Credit Suisse did not independently review the loans or provide a no-fraud rep, was expressly disclosed to MBIA and the certificateholders. Nonetheless, without conducting its own loan-level review — which it indisputably was capable of performing — MBIA provided financial guaranty insurance for the Transaction. MBIA sued (1) CSS, the underwriter, for fraud; (2) DLJ, the seller and sponsor, for breach of contract; and (3) SPS, the servicer, for breach of contract (but, as noted, recently withdrew that claim). MBIA did not sue the depositor, Credit Suisse First Boston Mortgage Securities Corp. (the Depositor). Nor is the trustee, U.S. Bank National Association (the Trustee), a party to this action.
Like the typical put-back plaintiff, MBIA seeks its contractual recourse for the existence of non-conforming loans in the Transaction (i.e., those that did not comply with representations and warranties). That recourse is founded upon two of the Transaction's governing contracts: (1) a Pooling and Servicing Agreement between the Depositor, DLJ, SPS, and the Trustee, dated as of April 1, 2007 (the PSA) (Dkt. 857); and (2) an Insurance Agreement between MBIA, the Depositor, DLJ, SPS, and the Trustee, dated as of April 30, 2007 (the Insurance Agreement) (Dkt. 854). Both contracts are governed by New York law. See Dkt. 857 at 191; Dkt. 854 at 38. While MBIA is not a party to the PSA, section 10.11 of the PSA provides that MBIA is an express third-party beneficiary and has the right to enforce the PSA as if it was a party. See Dkt. 857 at 194.[FN4]
 Most of the PSA's warranties are not the subject of these partial summary judgment motions and, therefore, will not be discussed.[FN5]
 The two warranties at issue on the instant motions are discussed in more detail below.
Section 2.03(e) of the PSA [see Dkt. 857 at 87-89], a so-called repurchase protocol, is the sole contractual remedy for the inclusion of non-conforming loans in the Transaction. See id. at 89 ("It is understood and agreed that the obligation under this Agreement of any Person to cure, repurchase or substitute any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedy against such Persons respecting such breach available to [*3]Certificateholders, the Depositor or the Trustee on their behalf.") (emphasis added).[FN6]
 Critically, section 2.03(e) further provides that, to be entitled to put back a non-conforming loan, in addition to establishing a breach of warranty, MBIA must also establish that such breach "materially and adversely affects the interests of the Certificateholders or [MBIA]." See id. at 87 (emphasis added).
In early 2010, Credit Suisse moved to dismiss the complaint. The court's resolution of that motion was somewhat atypical. As this court wrote:
In an order dated July 30, 2010 (MBIA I), this court initially declined to dismiss MBIA's fraud claims. See Dkt. 40. MBIA I, rendered in 2010, was the first decision in which this court grappled with the complexities of RMBS. Shortly after MBIA I [was issued, the court] realized it had erred. In an order dated June 1, 2011 (MBIA II) [see Dkt. 129], the court sua sponte vacated its MBIA I decision and dismissed the fraud claims. See 32 Misc 3d 758. MBIA II, in painstaking detail, parsed all of the relevant contracts, the prospectus supplement and case law, explaining why MBIA's fraud claims were not legally viable.
However, less than a month later, on June 30, 2011, the Appellate Division issued [MBIA Ins. Corp. v Countrywide Home Loans, Inc., 87 AD3d 287 (1st Dept 2011)], in essence, overruling MBIA II. MBIA, therefore, moved for renewal. In an order dated October 7, 2011 (MBIA III) [see Dkt. 157], the court felt compelled to reinstate MBIA's fraud claim, but it, nonetheless, extensively analyzed the transaction documents setting the case up for appeal. See 33 Misc 3d 1208(A). The court focused heavily on the prospectus and prospectus supplement, which provided MBIA with clear notice of the very loan issues that formed the gravamen of its fraud claims. For example, [MBIA III explained]:
[T]he Prospectus and ProSupp disclose that neither DLJ nor any of its affiliates re-underwrote any of the mortgage loans, the information in the Loan Schedule with respect to 83.73% of the mortgage loans was unverified, 59.65% of the loans had substantial balloons posing a special risk of non-payment in the event they could not be paid off or refinanced, and 14.87% were originated by New Century whose underwriting procedures might have been undermined by bankruptcy. In sum, the specific allegations in the complaint and the documentary evidence suggest that MBIA could not have reasonably "believe[d] in the truth of the warranted information ... but [only that] it was purchasing [DLJ's] promise as to its truth." [emphasis supplied]. This type of reliance is sufficient to sustain a breach of warranty claim, not a fraud claim based on misrepresentation.

MBIA III, 33 Misc 3d 1208(A), at *15 (bold in original; italics added). But Credit Suisse did not appeal, and MBIA II and MBIA III were never expressly considered at the appellate level.
Assured Guar. Mun. Corp. v DLJ Mort. Capital, Inc., 44 Misc 3d 1206(A), at *7 (Sup Ct, NY County 2014) (footnotes omitted).[FN7]

On January 30, 2013, MBIA filed an amended complaint (the AC). See Dkt. 391. The AC, which is MBIA's operative pleading, contains five causes of action: (1) fraudulent inducement against CSS; (2) breach of the Insurance Agreement against DLJ; (3) breach of the PSA's repurchase protocol against DLJ; (4) breach of the PSA against SPS (again, this claim was withdrawn); and (5) reimbursement under the Insurance Agreement against DLJ. MBIA seeks compensatory, consequential, rescissory, and punitive damages, and also seeks attorneys' fees. An answer to the AC was filed on March 8, 2013. See Dkt. 487.[FN8]

On March 25, 2016, after completion of fact and expert discovery, MBIA filed a Note of Issue. See Dkt. 845.[FN9]
 On May 11, 2016, the parties filed a joint statement of material undisputed facts. See Dkt. 849.[FN10]
 The instant motions were filed on June 2, 2016. MBIA's motion (Seq. 036) seeks summary judgment on: (1) the portion of its random loan sample (16%) for which Credit Suisse supposedly conceded the existence of a material warranty breach (the Unrebutted Loans); (2) the portion of that sample (14%) for which Credit Suisse did not produce (and does not have possession of) the applicable underwriting guidelines (the Missing Guidelines); (3) the meaning of the "MLS Warranty"; (4) the meaning of the "No Default Warranty"; and (5) the common law standard applicable to its fraudulent inducement claim based on the applicability of Insurance Law §§ 3105 and 3106. Credit Suisse's motion (Seq. 037) seeks: (1) dismissal of MBIA's fraudulent inducement claim based on the inability of MBIA to establish the element of reasonable reliance; (2) dismissal of MBIA's fraudulent inducement claim because the damages are duplicative of the damages available on MBIA's contractual put-back claims; and (3) a ruling that since MBIA chose not to purchase a no-fraud rep, the allegedly breached warranties should not be interpreted as tantamount to a no-fraud rep. The parties filed opposition to each other's respective motions on August 4, 2016, and reply papers were filed on September 22, 2016. The court reserved on the motions after oral argument. See Dkt. 1190 (11/15/16 Tr.).
II. Discussion
A. Legal Standard
Summary judgment may be granted only when it is clear that no triable issue of fact exists. Alvarez v Prospect Hosp., 68 NY2d 320, 325 (1986). The burden is upon the moving party to make a prima facie showing of entitlement to summary judgment as a matter of law. Zuckerman v City of New York, 49 NY2d 557, 562 (1980); Friends of Animals, Inc. v Associated Fur Mfrs., Inc., 46 NY2d 1065, 1067 (1979). A failure to make such a prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers. Ayotte v Gervasio, 81 NY2d 1062, 1063 (1993). If a prima facie showing has been made, the burden shifts to the opposing party to produce evidence sufficient to establish the existence of material issues of fact. Alvarez, 68 NY2d at 324; Zuckerman, 49 NY2d at 562. The papers submitted in support of and in opposition to a summary judgment motion are examined in the light most favorable to the party opposing the motion. Martin v Briggs, 235 AD2d 192, 196 (1st Dept 1997). Mere conclusions, unsubstantiated allegations, or expressions of hope are insufficient to defeat a summary judgment motion. Zuckerman, 49 NY2d at 562. Upon the completion of the court's examination of all the documents submitted in connection with a summary judgment motion, the motion must be denied if there is any doubt as to the existence of a triable issue of fact. Rotuba Extruders, Inc. v Ceppos, 46 NY2d 223, 231 (1978). 
B. The Unrebutted Loans
MBIA summarizes its argument with respect to the Unrebutted Loans as follows:
MBIA seeks summary judgment as to Credit Suisse's liability and damages for the loans where Credit Suisse does not dispute the existence of material breaches of representations and warranties. Credit Suisse's reunderwriting expert offered no rebuttal to MBIA's showing that 16% of the loans in a representative random sample of Transaction loans breach representations and warranties (the "[U]nrebutted [L]oans"). Because there are no factual disputes with respect to these loans, judgment should be entered that 16% of the sample loans materially and adversely breach representations and warranties. Further, applying MBIA's damages model, which Credit Suisse's damages expert does not challenge, MBIA's damages at this breach rate are $141.2 million. Therefore, the Court should hold that, subject to the resolution of any remaining challenge Credit Suisse may make to MBIA's sampling methodology, MBIA is entitled to $141.2 million for the unrebutted loans, plus reimbursement of its remediation costs and interest in amounts to be proven at trial.
Dkt. 930 at 7 (emphasis added); see id. at 19-21 (summarizing conclusions of parties' experts with respect to Unrebutted Loans); see also Dkt. 905 (Expert Report of Steven I. Butler) & Dkt. 917 (Expert Report of Christopher M. Gething).
Credit Suisse admits that its expert did not refute the fact that there are warranty breaches affecting the Unrebutted Loans. Nonetheless, Credit Suisse argues MBIA is not entitled to summary judgment on the Unrebutted Loans. Its arguments, set forth below, are premised on the well-settled rule that a party may successfully oppose a summary judgment motion without actually raising a question of material fact if the movant fails to meet its prima facie burden of proof. See Winegrad v NY Univ. Med. Ctr., 64 NY2d 851, 853 (1985) ("Failure to make such [a prima facie] showing requires denial of the motion, regardless of the sufficiency of the opposing papers.").
First, Credit Suisse argues that MBIA's expert, Mr. Butler, is not qualified to reunderwrite stated income loans (which compose 26 of the 64 Unrebutted Loans) because he has only done so while serving as an expert in RMBS litigation, and not in any other professional [*4]capacity. MBIA does not dispute that Mr. Butler's only experience reunderwriting stated income loans is in his capacity as an expert in RMBS litigation. But, MBIA notes, and Credit Suisse does not deny, that Mr. Butler has more than 40 years of experience in the mortgage industry, 17 of which were in mortgage origination. Credit Suisse also does not dispute that, aside from stated income loans, Mr. Butler has the requisite experience to reunderwrite loans and evaluate their conformity with underwriting guidelines. Indeed, in another case in which Mr. Butler was proffered as MBIA's expert, the court found him to be qualified. While the court did not specifically address Mr. Butler's expertise with respect to stated income loans, it reasoned that where, as here, the expert has "sufficient experience, training and knowledge in the loan industry, ... 'any alleged lack of knowledge in a particular area of expertise goes to the weight and not the admissibility of the testimony,' and [can be] cured with a limiting instruction to the jury." See MBIA Ins. Corp v Countrywide Home Loans, Inc., Index No. 602825/2008, Dkt. 4095 at 3-4 (Sup Ct, NY County Apr. 29, 2013) (Bransten, J.), quoting Bd. of Managers of 195 Hudson St. Condo. v 195 Hudson St. Assocs., LLC, 63 AD3d 523, 524 (1st Dept 2009), citing Moon Ok Kwon v Martin, 19 AD3d 664 (2d Dept 2005); see also Limmer v Rosenfeld, 92 AD3d 609 (1st Dept 2012) ("Once the expert professes such knowledge, the issue of the expert's qualifications to render such opinion must be left to trial"). Hence, while Mr. Butler's experience reunderwriting stated income loans may only have been obtained by virtue of his work in RMBS litigation, that fact does not justify the court precluding his stated income loan testimony. These are issues of credibility and weight, not admissibility and are issues for trial.
That being said, Credit Suisse's second argument is stronger, and warrants (with one narrow exception, noted below) denial of summary judgment on the Unrebutted Loans, necessitating a trial. As previously discussed, under section 2.03(e) of the PSA, only those warranty breaches that materially and adversely affect MBIA's interest in the loans are subject to being put-back. In other words, MBIA has no remedy for a warranty breach if the material and adverse element is not established. Thus, even assuming warranty breaches exist on each of the Unrebutted Loans, that fact, without more, is insufficient to grant summary judgment to MBIA. MBIA must also show, as part of its prima facie case, that such warranty breaches are material and adverse.
MBIA has not done so. That is because MBIA has not established what the "material and adverse" standard encompasses. To be sure, an apparent consensus has developed[FN11]
 that MBIA's risk of loss interpretation (e.g., the true debt-to-income ratio exceeded the guidelines to such an extent that a reasonable underwriter knowing the truth would never have approved the mortgage), as opposed to Credit Suisse's loss causation interpretation (i.e., the reason a non-conforming loan defaulted is due to the subject of a warranty breach, e.g., someone overstated their income and then lacked the means to make mortgage payments), is indeed the correct understanding of the material and adverse standard. See generally U.S. Bank, N.A. v UBS Real Estate Secs. Inc., 2016 WL 4690410 (SDNY 2016) (Castel, J.) (UBS), citing MASTR Adjustable Rate Mortgages Trust 2006-OA2 v UBS Real Estate Secs. Inc., 2015 WL 764665, at *15 (SDNY [*5]2015) (collecting cases); Assured Guar. Mun. Corp. v Flagstar Bank, FSB, 920 FSupp2d 475, 509 (SDNY 2013) (Flagstar) (Rakoff, J.) ("the further requirement that breaches of these representations and warranties be 'material and adverse' means that 'plaintiff must only show that [Flagstar's] breaches [of the representations and warranties] materially increased its risk of loss.'") (citations omitted). The First Department, however, has never ruled on the meaning of material and adverse in an RMBS contract.
There appears to be a split over whether the meaning of the words "material and adverse" is a question for the trier of fact or an issue of law that the court may decide on summary judgment. The federal courts in UBS and Flagstar decided the issue on summary judgment, while a state court has held that the issue is a question of fact for trial. See Ambac Assur. Corp. v Countrywide Home Loans, Inc., 2015 WL 6471943, at *11 (Sup Ct, NY County 2015) (Bransten, J.) (Countrywide IV); MBIA Ins. Corp. v Countrywide Home Loans, Inc., 39 Misc 3d 1220(A), at *29 (Sup Ct, NY County 2013) (Bransten, J.) (Countrywide III).[FN12]

Under New York law, "[a]mbiguity exists when, looking within the four corners of the document, the terms are reasonably susceptible of more than one interpretation." Ellington v EMI Music, Inc., 24 NY3d 239, 250 (2014). "A contract is unambiguous if 'on its face [it] is reasonably susceptible of only one meaning.'" Macy's Inc. v Martha Stewart Living Omnimedia, Inc., 127 AD3d 48, 54 (1st Dept 2015), quoting Greenfield v Philles Records, Inc., 98 NY2d 562, 570 (2002). Generally, "[i]f the court concludes that a contract is ambiguous, it cannot be construed as a matter of law." Telerep, LLC v U.S. Int'l Media, LLC, 74 AD3d 401, 402 (1st Dept 2010) (emphasis added). Consequently, "[w]here the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment." NFL Enterprises LLC v Comcast Cable Commc'ns, LLC, 51 AD3d 52, 61 (1st Dept 2008), quoting Pepco Const. of NY, Inc. v CNA Ins. Co., 15 AD3d 464, 465 (2d Dept 2005). In other words, the court may not resolve an ambiguity as a matter of law on the basis of there being a superior interpretation so long as there exists an inferior, albeit not unreasonable alternative interpretation. The court, of course, should strive to give effect to [*6]the superior interpretation, but that may only be done at trial.[FN13]
 An exception exists, however, when "[t]he documentary evidence submitted on summary judgment resolve[s] the ambiguity." Kolbe v Tibbetts, 22 NY3d 344, 355 (2013); see Chiusano v Chiusano, 55 AD3d 425, 426 (1st Dept 2008) ("Because the extrinsic evidence in the record is insufficient to resolve the ambiguity, the parties' intent must be determined at trial"); LoFrisco v Winston & Strawn LLP, 42 AD3d 304, 307 (1st Dept 2007) ("Since paragraph 2 of the 2001 agreement is reasonably susceptible to more than one interpretation, and the difficulty is not resolved by reading the agreement as a whole, the provision is ambiguous and neither side is entitled to summary judgment construing it as a matter of law.").
MBIA has not submitted evidence adduced in discovery that definitively proves the parties' intended meaning of "material and adverse." Despite the issue being extensively addressed at the pre-motion conference (see infra, n.15), the meaning of material and adverse is not addressed by MBIA's moving brief. See Dkt. 930 at 2. Tellingly, the expression "material and adverse" cannot be found in MBIA's moving brief (Dkt. 930); it appears 75 times in Credit Suisse's opposition brief (Dkt. 1044). MBIA's reply brief (Dkt. 1160) uses the expression 3 times, all in footnotes. While MBIA repeatedly and conclusorily states that the warranty breaches in the Unrebutted Loans are material, MBIA never explains what this means. Instead, MBIA simply relies on the fact that Credit Suisse's expert did not contest materiality. See, e.g., Dkt. 930 at 19. Moreover, MBIA barely mentions its "risk of loss" interpretation, doing so only in its introduction, without citation to authority [see id. at 13], and in the section of its brief devoted to the applicability of the Insurance Law. See id. at 39. Nowhere does MBIA actually address the sine qua non of contract interpretation — the parties' intent[FN14]
 — with respect to this issue. See Greenfield, 98 NY2d at 569. For this reason, ruling on the meaning of material and adverse would be improper before trial.
In this case, MBIA failed to carry its prima facie burden.[FN15]
 Therefore, MBIA's summary judgment motion with respect to the meaning of material and adverse must be denied. See Winegrad, 64 NY2d at 853. In the absence of a ruling on the meaning of material and adverse, MBIA cannot possibly be entitled to summary judgment on the Unrebutted Loans. Moreover, since the testimony of Mr. Butler with respect to the stated income loans is subject to credibility and weight determinations by the finder of fact, partial summary judgment on liability is denied on the existence of breaches in the portion of the Unrebutted Loans that are stated income loans.
However, the court grants partial summary judgment to MBIA with respect to the portion of the Unrebutted Loans that are not stated income loans. Credit Suisse may not contest the existence of the warranty breaches found by Mr. Butler that were not rebutted by Credit Suisse's expert. Critically, the questions of whether such breaches are material and adverse, the proper measure of damages on these loans, the sufficiency of the sample itself, and any other affirmative defense not at issue on this motion are not decided herein. This particular, narrow grant of partial summary judgment only precludes Credit Suisse from disputing at trial the existence of breaches in the portion of the Unrebutted Loans that are not stated income loans.
C. Missing Guidelines
MBIA also seeks summary judgment as to Credit Suisse's liability and damages for 14% of the random sample loans where Credit Suisse does not dispute that it failed to locate and produce the originator's underwriting guidelines [the Missing Guidelines]. [According to MBIA,] Credit Suisse admittedly obtained and had a duty to preserve underwriting guidelines to allow the truth of its warranties to be tested. Credit Suisse's [*7]breach of this [purported] duty entitles MBIA to its contractual remedies for these loans.
Dkt. 930 at 8.[FN16]

Credit Suisse contends, and MBIA concedes, that none of the Transaction's governing contracts expressly obligates Credit Suisse to maintain the underwriting guidelines for the loans securitized in the Transaction. Most of the loans were not originated by Credit Suisse. See Dkt. 849 at 20-21 (list of top 20 originators). Nor, on this motion, does MBIA allege that Credit Suisse had possession of the Missing Guidelines and intentionally disposed of them. Indeed, no one has proffered an explanation of when, if ever, Credit Suisse actually had these guidelines, and when, if it had them, they were lost. MBIA, moreover, does not actually deny that it could have, both before the Transaction closed and during discovery, sought the guidelines from the originators. All that is undisputed is that neither party has possession of these guidelines and that they will not be available for use at trial.
The parties, unsurprisingly, dispute the implications of the Missing Guidelines. MBIA contends that Credit Suisse has an implied duty of good faith and fair dealing under the PSA to maintain the guidelines. By virtue of this alleged implied covenant breach (which is not pleaded in the AC), MBIA avers that it should win, by default, on loans where the guidelines are missing (i.e., on 14% of its sample).[FN17]
 Credit Suisse disagrees, and contends that the Missing Guidelines are MBIA's problem, and that it will have to prove its case at trial without them (and, inferentially, lose on claims where their introduction into evidence is required to establish a guideline breach).
The court rejects both parties' approach to this issue. The covenant of good faith and fair dealing, of course, is implied in every contract. 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 (2002). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Id., quoting Dalton v Educational Testing Serv., 87 NY2d 384, 389 (1995). "While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship,' they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" Id., quoting Murphy v Am. Home Prods. Corp., 58 NY2d 293, 304 (1983) and Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69 (1978). However, "[t]he covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights." Nat'l Union Fire Ins. Co. of Pittsburgh, PA v Xerox Corp., 25 AD3d 309, 310 (1st Dept 2006) (emphasis added). In other words, the implied covenant, especially in a complex commercial agreement, is not a substitute [*8]for obtaining the benefit of contractual terms not capable of being procured at the negotiating table. See ELBT Realty, LLC v Mineola Garden City Co., 144 AD3d 1083, 1084 (2d Dept 2016) ("courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."), citing Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 72 (1978) ("such lack of foresight does not create rights or obligations."), quoting Mut. Life Ins. Co. of NY v Tailored Woman, Inc., 309 NY 248, 253 (1955). Thus, MBIA must establish that Credit Suisse, "in bad faith, engaged in acts that had the effect of destroying or injuring [MBIA's] right to receive 'the fruits of the contract.'" Demetre v HMS Holdings Corp., 127 AD3d 493, 494 (1st Dept 2015) (emphasis added), quoting Dalton, 87 NY2d at 389.
MBIA not only avers that Credit Suisse's failure to maintain all of the applicable guidelines is an implied covenant breach, but that the proper remedy, effectively, is a default judgment on the loans for which there are missing guidelines. The court disagrees.[FN18]
 No reasonable finder of fact could conclude that Credit Suisse had an obligation to maintain guidelines on pain of a possible future put-back claim being decided on default in MBIA's favor.[FN19]
 That Credit Suisse represented it generally maintained underwriting guidelines is of no moment. It is undisputed that this was Credit Suisse's practice and that most of the applicable guidelines were maintained by Credit Suisse, produced in discovery, and are available to MBIA for use at trial. The issue is not Credit Suisse's wholesale failure to maintain guidelines, but the fact that, almost a decade after the Transaction closed, Credit Suisse's records are devoid of a handful of them. At best, MBIA has established that Credit Suisse was negligent in how it maintained guidelines. Negligence is not bad faith. See Wandel v Dimon, 135 AD3d 515, 516 (1st Dept 2016). Without bad faith, MBIA's implied covenant claim fails.
The proper redress for the Missing Guidelines is neither an independent cause of action or default judgment, but an appropriate trial remedy, such as an adverse inference regarding missing documents or spoliation. Bad faith is critical when seeking negative ramifications for failure to maintain evidence. See Pegasus, 26 NY3d at 547 (addressing requisite culpability standards for spoliation, distinguishing between "intentionally or willfully" and negligently destroyed evidence). The court will not decide what remedy is appropriate at this juncture, as that is best left to adjudicate on a motion in limine. Summary judgment based on the Missing [*9]Guidelines is denied.[FN20]

D. MLS Warranty
A warranty is "'an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.'" [CBS Inc. v Ziff—Davis Pub. Co., 75 NY2d 496, 503 (1990), quoting Metropolitan Coal Co. v Howard, 155 F2d 780, 784 (2d Cir 1946) (Hand, J.)]. An "express warranty is as much a part of the contract as any other term." [Id. at 503.]
UBS, 2016 WL 4690410, at *18.
The MLS Warranty, the fifth warranty listed in schedule IV to the PSA, provides that "[t]he information set forth in the Mortgage Loan Schedule [the MLS], attached to the [PSA] as Schedule I, is complete, true and correct in all material respects as of the Cut-off Date." See Dkt. 857 at 328.[FN21]
 The parties dispute whether this warranty guaranteed the accuracy of the information in the MLS or if it only guaranteed that the information in the MLS was accurately transcribed from the loan file. MBIA argues the former position; Credit Suite argues the latter. The court agrees with MBIA. The MLS Warranty states that "[t]he information in the Mortgage Loan Schedule" is actually "true and correct," not that it merely reflects the information in the loan file.
Notwithstanding the MLS Warranty's plain meaning, Credit Suisse contends that its interpretation must be correct because that plain meaning is tantamount to a no-fraud rep, i.e., a representation that a borrower did not, for instance, provide false information when applying for the loan. Credit Suisse contends that since the Transaction included stated income loans, where the borrowers would merely have to "state" their income without providing verification,[FN22]
 an MLS Warranty that guaranteed the accuracy of the information provided by the borrower would, in effect, be tantamount to a no fraud rep.
As an initial matter, the court does not consider the extrinsic evidence proffered by Credit Suisse because the court finds that the MLS Warranty is unambiguous. See W.W.W. Assocs., Inc. v Giancontieri, 77 NY2d 157, 163 (1990) ("extrinsic and parol evidence is not admissible to [*10]create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."). Nor does the court consider Credit Suisse's argument that it would be commercially unreasonable in this case to interpret the MLS Warranty as giving rise to liability for information contained in the MLS that does not reflect reality. See Fundamental Long Term Care Holdings, LLC v Cammeby's Funding LLC, 20 NY3d 438, 445 (2013) ("an inquiry into commercial reasonableness is only warranted where a contract is ambiguous"). That Credit Suisse may have thought the MLS Warranty would not provide protection against any form of borrower fraud is of no moment. A party's own subjective understanding of a contract, even if it makes commercial sense, is irrelevant when interpreting an unambiguous contract. See id.
In responding to Credit Suisse's argument, MBIA does not dispute that the MLS Warranty covers some (but not all) borrower fraud. Nonetheless, MBIA explains that, in reality, the plain meaning of the MLS Warranty (i.e., a guaranty of the information's truth) is not identical to a classic no-fraud rep (which, as noted, MBIA concedes it did not procure):
The MLS Warranty is an absolute guarantee that certain loan-specific information is "complete, true and correct." A breach of the MLS Warranty therefore depends on whether the specified loan information accurately reflects reality, not on why the information is false. In other words, whether there is a breach does not depend on the circumstances that led to the inclusion of false information on the MLS. Consequently, the MLS Warranty may be breached as a result of fraud, misrepresentation, omission, mistake, error or negligence at any time during the securitization process—but only as it relates to the specific, narrowly-defined set of material loan characteristics on the MLS. By contrast, the proposed Fraud Warranty would have covered any "fraud" at loan "origination," without limitation to misrepresentations of the specific information included on the MLS—but only in those instances where the higher level of proof showing an intent to deceive was met. Thus, although the MLS Warranty is tailored to the specific set of material metrics on the MLS, a more limited showing is required to establish a MLS Warranty breach with respect to those metrics than is required to show that they were fraudulently made. The scope and the protections afforded by the MLS Warranty and Fraud Warranty are clearly distinct, and the plain wording of the MLS Warranty is not in any respect rendered ambiguous by MBIA's agreement that it did not require a Fraud Warranty to adequately protect its rights.
See Dkt. 930 at 33 (emphasis added; citations omitted).
This court, in a decision affirmed by the Appellate Division and the Court of Appeals, has held that a warranty substantially similar to the MLS Warranty is unambiguous and actually warrants the truth of the information on the loan tape. Bank of NY Mellon v WMC Mort., LLC, 41 Misc 3d 1230(A) (Sup Ct, NY County 2013) (WMC I), rearg. denied 2014 WL 3738083 (Sup Ct, NY County 2014) (WMC II), aff'd 136 AD3d 1 (1st Dept 2015) (WMC III), aff'd 28 NY3d 1039 (2016).[FN23]
 Credit Suisse correctly observes that the key issue in WMC was whether [*11]JPMorgan had so-called "gap" or "bring down" liability, which turned on a temporal caveat to the loan tape warranty. Nonetheless, in deciding that issue, it was necessary for the court to opine on the meaning of the loan tape warranty since its meaning was critical to the court's rationale on the temporal issue. See WMC I, 41 Misc 3d 1230(A), at *4-5; WMC II, 2014 WL 3738083, at *1-2. That rationale was expressly adopted by the Appellate Division, which, importantly, also described the loan tape warranty in the same manner as this court. See WMC III, 136 AD3d at 8 ("Because JPMMAC was warranting the veracity of information that, by definition, could not change after the origination date, the warranty was not merely a bring-down or gap warranty") (emphasis added).
Other courts have come to the same conclusion. In UBS, Judge Castel set forth a thorough explanation about why, even in a contract that does not have a no-fraud rep, an MLS Warranty does not "merely guarantee accurate transcription":
UBS argues that the MLS Warranty is "more reasonably read as a transcription rep," and should be interpreted as "referring only to information 'furnished' to UBS RESI regarding loans it did not originate ....". It argues that UBS could not guarantee the absolute truth of the thousands of MLS data points, and that the more plausible reading is that UBS accurately transcribed the information as transmitted to it by the Originators.
UBS's argument is not supported by the language of the PSAs. As noted, the MLS Warranty is not limited to UBS's knowledge or belief; it is an unqualified warranty. The PSAs could have been drafted to state that the MLS reflected only an accurate transcription of the information communicated by the Originators. But there is no such limitation, and courts "must be careful not to add new terms or alter the terms of the contract in the guise of interpreting it." Without qualification, the MLS Warranty states that the MLS "was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the Mortgage Loan Schedule ...." This language expressly warrants the truth and correctness of the information "furnished" in the MLS on the dates specified therein.

It is true that the MLS Warranty imposes a form of strict or absolute liability for a materially untrue or incorrect statement on the MLS. . Symmetrical or not, harsh or not, this is the bargain to which UBS, a sophisticated financial institution, agreed.

UBS argues that, unlike other RMBS transactions, the PSAs here do not contain a warranty against borrower fraud. UBS argues that to interpret the MLS Warranty as directed to more than the accuracy of transcription is the equivalent to imposing a no-fraud warranty that the parties did not negotiate. UBS overstates the case. The MLS may contain an incorrect item of information as a result of an innocent mistake and yet be liable to the Trusts for the untrue and incorrect information. Imputing fraud or fault on the part of a borrower, underwriter or any other person or entity, including UBS, is not an element of the claim. UBS asserts that many of its employees and others in the RMBS field thought of a MLS Warranty as merely a transcription warranty and that it should be interpreted as a warranty that UBS accurately transmitted the information received from the Originator with no assurance as to its accuracy. The interpretation is flatly contradicted by the plain and unambiguous terms of [*12]the MLS Warranty. UBS's attempt to rely on parol evidence or custom and usage to vary, modify or contradict the terms of a plain and unambiguous provision is meritless.
UBS, 2016 WL 4690410, at *31-32 (citations omitted; emphasis added).
Since there is binding precedent holding that the MLS Warranty is not ambiguous, the court is legally prohibited from considering parol evidence to interpret it. And even if there was no binding precedent (i.e., if the MLS Warranty ruling in WMC was mere dicta), the court would still adhere to its own WMC decisions, which are in accordance with UBS and, in this court's view, the plain meaning of the MLS Warranty. Summary judgment, therefore, is granted to MBIA on the meaning of the MLS Warranty.
E. No Default Warranty
The No Default Warranty, the forty-fifth warranty listed in schedule IV to the PSA,
provides:
There is no material monetary default existing under any Mortgage or the related Mortgage Note and there is no material event that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note and no such material default, breach, violation or event of acceleration has been waived by the Seller in connection with the origination or servicing of the related Mortgage Loan; and none of the Seller or any prior holder of the Mortgage has waived any default, breach, violation or event of acceleration or received notice of default of any senior mortgage loan related to a Mortgaged Property that has not been cured by a party other than the Seller, such holder or the Servicer.
See Dkt. 857 at 335 (emphasis added).
Credit Suisse relies on the words bolded above to argue that the No Default Warranty merely "provides assurance that borrowers are not materially delinquent on the financial obligations under their mortgages." See Dkt. 1044 at 30 (emphasis added). Credit Suisse contends that the words "monetary default", read in context with the expression "material event" being caveated with the opportunity to cure, suggests that only curable defaults (i.e., nonpayment, not fraud) are governed by the No Default Warranty. MBIA has a different view. It argues that the cure period caveat does not mean (nor does it state) that only those defaults which are curable are subject to the No Default Warranty.
The court agrees with MBIA. Quite intuitively, liability under this warranty does not arise unless a default is actualized, instead of being temporarily extant. In other words, Credit Suisse is not liable if there is a curable default that exists for a few weeks, but which is timely cured. Just because it is the case that a default being cured provides Credit Suisse with this protection, it does not follow that any default incapable of being cured is not governed by the No Default Warranty. If, as Credit Suisse contends, the No Default Warranty only governs monetary or cureable defaults, it would simply have just said so. To interpret the No Default Warranty in the manner proposed by Credit Suisse would render the "no material event" language to be surplusage. See In re Viking Pump, Inc., 27 NY3d 244, 257 (2016), citing Westview Assocs. v Guar. Nat'l Ins. Co., 95 NY2d 334, 339 (2000) ("surplusage" is "a result to be avoided"). Applying similar reasoning, other courts have reached this conclusion. See [*13]Countrywide IV, 2015 WL 6471943, at *5-6; Countywide III, 39 Misc 3d 1220(A), at *29-30.[FN24]
 Summary judgment is granted to MBIA on this issue.[FN25]

F. Applicability of the Insurance Law & Loss Causation
The final issue on which MBIA seeks summary judgment is the legal standard applicable to its fraud claim. Specifically, the issue is whether Insurance Law §§ 3105 and 3106 alter or eliminate any of the elements of the common law standard that would otherwise be applicable to MBIA's claim that it was fraudulently induced to provide financial guaranty insurance for the Transaction. Those elements are "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 (2009); see Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 135 (1st Dept 2014). Ergo, a fraud plaintiff must, ordinarily, prove justifiable reliance and loss causation. Bank Hapoalim B.M. v WestLB AG, 121 AD3d 531, 535 (1st Dept 2014); see Basis Pac-Rim Opportunity Fund (Master) v TCW Asset Mgmt. Co., 2017 WL 809507 (1st Dept Mar. 2, 2017) (dismissing RMBS fraud claim for failure to prove loss causation).
"New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations by investigating the details of the transactions." Global [*14]Minerals & Metals Corp. v Holme, 35 AD3d 93, 100 (1st Dept 2006). "Where a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable reliance on defendant's misrepresentations." Stuart Silver Assoc. v Baco Dev. Corp., 245 AD2d 96, 98-99 (1st Dept 1997); see MP Cool Investments Ltd. v Forkosh, 142 AD3d 286, 291 (1st Dept 2016); HSH Nordbank AG v UBS AG, 95 AD3d 185, 195 (1st Dept 2012); UST Private Equity Invs. Fund v Salomon Smith Barney, 288 AD2d 87, 88 (1st Dept 2001).
It is undisputed that MBIA did not conduct an independent review of the loans in the Transaction and that, if MBIA's expert report is correct, there is no question that even a de minimis review of loans would have revealed serial nonconformance. Credit Suisse explains:
MBIA asserts that it can estimate the alleged rate of defective loans in the trust simply by re-underwriting a sample of 400 loans. According to MBIA's proffered expert, 77% of a sample of 400 loans breached a R & W. There is no reason MBIA could not have reviewed 400, or 200, or 50 loans [out of more than 15,000] in April 2007, and applied whatever underwriting standards MBIA chose. If—as MBIA claims—three out of four loans truly breached R & Ws, then reviewing only a few loans should have revealed that the various alleged representations were unreliable, or that MBIA needed to inquire further.
MBIA could have performed this review of a sample of loan files in 2007. MBIA has not alleged that it could not have obtained the loan files by request.MBIA's representatives got all the information they requested from Credit Suisse. They did not ask for loan files. Two months elapsed between Credit Suisse's solicitation of a bid on March 2 and the closing on April 30.
See Dkt. 994 at 38-39 (emphasis added; citations omitted).
To be clear, MBIA does not contend that, had it wished to conduct its own loan level review, it would have lacked the means to do so. This appears to be, contrary to binding First Department precedent [see Phoenix Light SF Ltd. v Credit Suisse AG, 144 AD3d 537 (1st Dept 2016) (collecting cases regarding duty to conduct independent loan-level review)], a classic case where basic due diligence would have revealed the very fraud MBIA now sues upon. See Northern Group Inc. v Merrill Lynch, Pierce, Fenner & Smith Inc., 135 AD3d 414 (1st Dept 2016) ("Nor could these sophisticated plaintiffs have reasonably relied on the alleged misrepresentations in this arm's-length transaction, since they admit that they never read the relevant prospectuses, which were filed with the Securities and Exchange Commission (SEC) and were publicly available through SEC's website, and from which plaintiffs could have ascertained the specific risks that they claim were not disclosed to them."), citing HSH Nordbank, 95 AD3d at 193-94, citing MBIA Ins. Corp. v Merrill Lynch, 81 AD3d 419 (1st Dept 2011) ("Given their level of sophistication and the undisputed fact that the information was not exclusively in defendants' possession, plaintiffs' contention that it would have been impractical to conduct the investigation necessary to discern the truth of defendants' allegedly fraudulent representations does not satisfy the requirements of the peculiar knowledge exception."). Indeed, notwithstanding Phoenix Light and the precedent cited therein, the First Department has suggested that loan level due diligence may be a dispositive factor. See CIFG Assur. N. Am., Inc. v Goldman, Sachs & Co., 106 AD3d 437, 437-38 (1st Dept 2013) ("In this action by plaintiff arising from its financial guaranty of a residential mortgage-backed securities investment, the cause of action for fraudulent inducement should not have been dismissed. [*15]Plaintiff conducted its own due diligence, utilizing an outside consultant to analyze the characteristics of the underlying loans."), distinguishing Barneli & Cie SA v Dutch Book Fund SPC, Ltd., 95 AD3d 736, 736-37 (1st Dept 2012) ("The fourth cause of action (for fraud) is not viable, given the representations and warranties that plaintiff made in the Subscription Agreement that it signed and the fact that it failed to investigate before investing $50 million in defendant.").
In this case, MBIA, which is in the business of insuring risk, admits that it made a business decision to forgo reviewing loans, a practice it previously employed. "The cost of such review, in relation to the risk exposure of $767 million, and the expected revenue of $3.8 million in premiums, would have been negligible. At the time of [the Transaction], MBIA could have re-underwritten 400 loans for $80,000, or 200 loans for $40,000, or less if it chose." See Dkt. 994 at 39 (emphasis added; citations omitted). In fact, "MBIA in years past had itself undertaken its own loan file diligence, but around 2002, MBIA made a business decision to eliminate it." See id. at 40.
For good reason, there is no case that excuses an unreasonable failure to conduct due diligence because a company wanted to save a little money. When insuring a deal worth hundreds of millions or billions of dollars, that it would have merely cost tens of thousands of dollars to reunderwrite a small sample of loans should be enough proof that MBIA's reliance was not reasonable. Nevertheless, based on binding First Department precedent[FN26]
 and because the loss causation and duplication of damages issues are sufficient to dismiss the fraud claim, the court will not reach the issue of whether MBIA could prove reasonable reliance or if such element need be proven by virtue of the Insurance Law's applicability.
Causation and damages, however, are another matter. "To establish causation, plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." Laub v Faessel, 297 AD2d 28, 31 (1st Dept 2002) (collecting cases; emphasis added); see generally Loreley Fin. No. 3 Ltd. v Wells Fargo Secs., LLC, 797 F3d 160, 183 (2d Cir 2015). Loss causation, simply put, "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" Fin. Guar. Ins. Co. v Putnam Advisory Co., 783 F3d 395, 402 (2d Cir 2015), quoting Lentell v Merrill Lynch & Co., 396 F3d 161, 172 (2d Cir 2005). There is no question that loss causation is an essential element of a fraud claim and that, if it is not proven, the fraud claim must be dismissed. Gregor v Rossi, 120 AD3d 447, 448 (1st Dept 2014); Mosaic Caribe, Ltd. v AllSettled Grp., Inc., 117 AD3d 421, 422 (1st Dept 2014); Greentech Research LLC v Wissman, 104 AD3d 540 (1st Dept 2013).
That being said, it is MBIA's position that Insurance Law §§ 3105 and 3106 apply to its [*16]fraud claim and that these statutes eliminate the requirement of proving reasonable reliance and loss causation. Credit Suisse disagrees and maintains that MBIA must prove every element of the ordinary common law fraud standard. As noted, the court will only reach the issue of loss causation (and not reasonable reliance) because it is dispositive.
Contrary to what MBIA would have the court believe, neither the First nor Second Departments have clearly held that §§ 3105 and 3106 eliminate the requirement of proving loss causation. The genesis of the applicable Appellate Division precedent is MBIA Ins. Corp. v Countrywide Home Loans, Inc., 34 Misc 3d 895 (Sup Ct, NY County 2012) (Bransten, J.) (Countrywide I), where, respectfully, the court made two seemingly contrary holdings with respect to loss causation. First, the court held that "no basis in law exists to mandate that MBIA establish a direct causal link between the misrepresentations allegedly made by Countrywide and claims made under the policy." See id. at 906. But two paragraphs later, the court held that "MBIA must then prove that it was damaged as a direct result of the material misrepresentations." See id. (emphasis added). The First Department affirmed, but did not substantively address loss causation. It merely held that "the motion court was not required to ignore the insurer/insured nature of the relationship between the parties to the contract in favor of an across the board application of common law." See MBIA Ins. Corp. v Countrywide Home Loans, Inc., 105 AD3d 412 (1st Dept 2013) (Countrywide II).[FN27]
 Recently, the Second Department also held that § 3105 is applicable to monoline RMBS cases. See MBIA Ins. Corp. v J.P. Morgan Secs., LLC, 144 AD3d 635, 639 (2d Dept 2016) (J.P. Morgan) ("the Supreme Court improvidently exercised its discretion in denying that branch of the plaintiff's motion which was for leave to assert its cause of action denominated as material misrepresentation in the procurement of an insurance contract 'brought under common law as informed by New York Insurance Law Section 3105.'"). The Second Department did not address the impact of §§ 3105 and 3106 on loss causation.[FN28]

In a subsequent summary judgement decision issued by the Countrywide I court, in a section entitled "Measure of Damages", the court wrote that "although causation is not necessary to demonstrate Countrywide's liability, Ambac's damages can only be calculated by reference to claims payments made because of the breach of the R & Ws." Countrywide IV, 2015 WL 6471943, at *8 (emphasis added). The Countrywide IV court, in making this ruling, favorably quoted from Countrywide's brief ("To the extent a claims payment is made unrelated to a breach of an R & W, Countrywide persuasively argues that 'Ambac cannot recover for the very risk it assumedlosses stemming from conforming loans.'") and also from this court's decision in Assured ("a monoline cannot recover for the very risk it assumed."). See id. at *9. However, in the very next section entitled "No Need to Show Proximate Causation for Purposes of Liability", the court wrote that, pursuant to Countrywide II, "plaintiff was not required to establish causation in order to prevail on its fraud and breach of contract claims." See id.
The seemingly contrary loss causation holdings in Countrywide I and Countrywide IV can be reconciled. Both decisions indicate at one point that loss causation is not required to be proven, but, nonetheless, also expressly limit the monoline's damages by resorting to loss causation rules, i.e., by requiring a nexus between damages and non-conforming loans. Countrywide I and Countrywide IV appear to stand for the proposition that while the element of loss causation need not be proven for the monoline to establish liability, loss causation principles must be applied when determining damages. Support for this proposition can be found elsewhere in Countrywide IV:
Rescissory damages, which are not available to Ambac, would put Ambac in the same position as if it had never agreed to insure the securitizations. This would be accomplished by repaying Ambac for all claims payments that it makes, regardless of their relation to any misrepresentation. In contrast, compensatory damages, which are available to Ambac, would put Ambac in the same position it would have been in if Countrywide had never breached in the first instance. This means that although causation is not necessary to demonstrate Countrywide's liability, Ambac's damages can only be calculated by reference to claims payments made because of the breach of the R & Ws.
Countrywide IV, 2015 WL 6471943, at *8 (emphasis added; citations omitted).[FN29]

This holding must be regarded as more than persuasive authority because it is based on the Countrywide IV court's prior holding in Countrywide I, which was affirmed by the First Department in Countrywide II. As previously observed, Countrywide II did not actually analyze the loss causation issue; it merely affirmed the loss causation holding of the trial court in Countrywide I. See Ambac, 2016 WL 7374210, at *17 ("The Appellate Division's decision in [Countrywide II] did not set forth the basis for affirmance of the trial court's causation holding. The decision did not discuss loss causation and did not otherwise discuss the standards for proof of causation of damages in a fraud or breach of warranty claim, whether brought under the common law or pursuant to Insurance Law § 3105 or § 3106."). This court assumes that the Countrywide IV court, which issued Countrywide I, is in the best position to interpret its own rulings. The Countrywide IV court clearly felt that mandating a nexus between non-conformance and a monoline's losses did not contravene its prior holding in Countrywide I that a monoline does not have to prove loss causation as an element of its fraud claim. Hence, notwithstanding Countrywide II, MBIA is foreclosed from recovering losses attributable to conforming loans. See Countrywide IV, 2015 WL 6471943, at *9 ("to the extent that Ambac is entitled to receive an award of damages unrelated to the repurchase protocol, the amount of damages must be calculated in reference to claims payments made due to loans breaching R & Ws.") (emphasis added). This, effectively, renders academic the issue of whether loss causation is itself an element of MBIA's fraud claim because MBIA still is subject to the true effect of a loss causation requirement: limiting the damages recoverable by requiring a nexus between the fraud and the damages. This court, therefore, adheres to its ruling in Assured, endorsed by Countrywide IV, that a monoline, such as MBIA, cannot recover "losses stemming from conforming loans" because "a monoline cannot recover for the very risk it assumed." See Countrywide IV, 2015 WL 6471943, at *9, quoting Assured, 44 Misc 3d 1206(A), at *11.
That being said, were this court writing on a blank slate, it would still come to the same conclusion based on the plain meaning of §§ 3105 and 3106. See People v Finnegan, 85 NY2d 53, 58 (1995) ("The governing rule of statutory construction is that courts are obliged to interpret a statute to effectuate the intent of the Legislature, and when the statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of [the] words'"), quoting People v Sullivan, 74 NY2d 305, 309 (1989), accord People v Badalamenti, 27 NY3d 423, 443 (2016). § 3105 is titled "Representations by the insured", as it addresses what types of misrepresentations may give rise to liability. § 3105(a) provides:
A representation is a statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof. A misrepresentation is a false representation, and the facts misrepresented are those facts which make the representation false.
(emphasis added). Here, MBIA is the insurer and, as noted, the court is assuming that Credit [*17]Suisse is the "applicant for insurance."
The implications of a misrepresentation under § 3105(a) are addressed in § 3105(b)(1):
No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract.
(emphasis added).[FN30]
 MBIA maintains that since the only elements mentioned in §§ 3105(a) and (b)(1) are falsity and materiality, the other usual elements of a fraud claim, such as loss causation, need not be proven.
§ 3106, however, specifically addresses the implications of the type of misrepresentations at issue in this case — false warranties in an insurance contract.[FN31]
 § 3106 is titled "Warranty defined; effect of breach". § 3106(a) defines "warranty" as:
any provision of an insurance contract which has the effect of requiring, as a condition precedent of the taking effect of such contract or as a condition precedent of the insurer's liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract.
(emphasis added). In fact, MBIA's view of section 2.03(e) of the PSA effectively tracks § 3106(a) because MBIA avers that its put-back rights do not leave it with net liability for loans where there is a warranty breach that increases MBIA's risk of loss.[FN32]
 While MBIA is fond of [*18]this risk of loss theory, § 3106(b) explicitly tethers the concept "risk of loss" to a loss causation standard:
A breach of warranty shall not avoid an insurance contract or defeat recovery thereunder unless such breach materially increases the risk of loss, damage or injury within the coverage of the contract. If the insurance contract specified two or more distinct kinds of loss, damage or injury which are within its coverage, a breach of warranty shall not avoid such contract or defeat recovery thereunder with respect to any kind or kinds of loss, damage or injury other than the kind or kinds to which such warranty relates and the risk of which is materially increased by the breach of such warranty.
(emphasis added). The First Department has held that § 3106(b), as its plain meaning suggests, entails a loss causation requirement, that is, a requirement that there be a nexus between the subject matter of the warranty and the cause of the loss. See Anghel v. Utica Mut. Ins. Co., 127 AD3d 897, 900 (1st Dept 2015) ("as the warranty related only to fire loss, any breach thereof could not defeat recovery on the plaintiff's claim for flood loss."); M. Fabrikant & Sons, Inc. v Overton & Co. Customs Brokers, 209 AD2d 206, 207 (1st Dept 1994) ("the breach materially increased the risk of loss within the meaning of Insurance Law § 3106(b) and thus there is no coverage as a matter of law").
MBIA correctly observes that § 3105 does not mention loss causation. However, § 3105 also never states that loss causation is not required to be proven. Where, as here, the subject misrepresentations are predicated on the falsity of warranties, this court would be in contravention of the First Department's mandate if it ignored the parties' insurer/insured relationship. Faithfully doing so requires applying a loss causation standard to claims based on a warranty being false. Since § 3105 is silent on the issue of loss causation and it is clear from § 3106 that insurance companies cannot avoid liability due to false warranties if such losses are not related to the subject matter of the warranty, harmonizing §§ 3105 and 3106 requires MBIA to prove loss causation when its fraud claim is based on false warranties.
This conclusion comports with the public policy reasons for mandating that a fraud plaintiff prove loss causation. See Loreley, 797 F3d at 185 (loss causation "is virtually always required" to be proven on both law and policy grounds). "However one feels about loss causation, a plaintiff must ultimately prove this element to prevail on a fraud claim under New York law." Id. at 187 n.20; see id. at 182 n.14 (loss causation in securities litigation is "an issue reserved for summary judgment"); see also Basis Pac-Rim, 2017 WL 809507, at *2-3 (dismissing RMBS fraud claim on summary judgment due to lack of loss causation proof). Indeed, in the most recent Court of Appeals case to consider a monoline insurance company's fraud claim, the applicable fraud standard recited by the Court was the usual common law [*19]standard. See ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1044 (2015).[FN33]
 While §§ 3105 and 3106 were not specifically at issue in that case, presumably, the Court would not have stated that the normal common law elements apply if (according to MBIA) certain of those elements — such as loss causation — need not be proven by virtue of the plaintiff being an insurance company.
While ACA involved financial guaranty insurance for a synthetic collateralized debt obligation (the now-infamous ABACUS CDO), and not for an RMBS, if anything, that difference only bolsters the notion that the common law fraud elements are applicable. Since ACA did not involve warranties like those in the PSA, but rather the net investment position of the "secret" collateral selector (Paulson), there would have been no basis to apply the statutory loss causation mandate of § 3106. By MBIA's logic — that any insurance company who sues for misrepresentations that induced the issuance of a policy need not prove reasonable reliance or loss causation — the usual common law fraud elements would not have applied in ACA. It is hard to believe, if that were so, that the Court of Appeals would have made such a fundamental error about the applicable law or that such an obvious dispositive issue would have been overlooked by the able counsel in that case. As in ACA, MBIA must prove the common law elements of fraud, including loss causation. That being said, as discussed earlier, for all practical purposes, the question of whether MBIA must prove loss causation to establish fraud liability is, effectively, a red herring because its damages are capped, effectively, by what a loss causation element would usually restrict.
In sum, the court does not find there to be any binding precedent that precludes this court from limiting MBIA's damages to those incurred due to non-conforming loans. Countrywide I, Countrywide II, and Countrywide IV, as discussed, support this court's conclusion (as does Ambac). As this court held in Assured, which was cited to and quoted from approvingly by Countrywide IV, when assessing the ways in which the common law should be informed by the Insurance Law, it is essential to consider the whole of the Insurance Law so as not to fashion a rule that is commercially unreasonable and which would otherwise contravene fundamental principles of insurance. See Assured, 44 Misc 3d 1206(A), at *10. MBIA may not cherry pick those portions of the Insurance Law that benefit it while ignoring those that do not. There is no principled basis to focus exclusively on § 3105 and not consider § 3106. The court cannot ignore the fact that § 3106 inexorably links warranty claims and loss causation.
The court, therefore, holds that MBIA may not recover any portion of its claim payments attributable to conforming loans. "[A] prohibition on insurance companies recovering their [*20]claims paid in a manner which retroactively eliminates for themselves the very risk they insured (conforming loan losses) is precisely the sort of insurance law principle that should 'inform' [MBIA's] fraud claims because this court is not supposed to ignore the 'insurer/insured nature of the relationship between the parties.'" Assured, 44 Misc 3d 1206(A), at *10. "Conforming loan losses are not recoverable because conforming loan losses do not arise from a breach. This, at the end of the day, is really the point: a monoline cannot recover for the very risk it assumed." Id. (italics in original).
Indeed, recovery of losses incurred on conforming loans is simply a species of rescissory damages. See Ambac, 2016 WL 7374210, at *15 ("Courts considering requests by monoline insurers for damages in the form of all claims paid and due in the future under irrevocable insurance policies have concluded that such damages are, in effect, rescissory damages."). That is because the only situation in which MBIA could avoid losses on conforming loans is one where it never insured the Transaction. Limiting MBIA's recovery to losses incurred due to non-conforming loans comports with the traditional out-of-pocket rule (discussed below) and with its agreement to insure the risk of loss on conforming loans. In contrast, an award of rescissory damages, where MBIA recoups all of its claim payments, regardless of their relationship to non-conforming loans, would not comport with the out-of-pocket rule, the discussed loss causation principles, and the parties' risk allocation agreement. It is unsurprising, therefore, that the First Department has foreclosed MBIA's ability to do so. Countrywide II, 105 AD3d at 413; see Countrywide IV, 2015 WL 6471943, at *8 ("Ambac acknowledges that under First Department precedent [i.e., Countrywide II] it is not entitled to rescission or rescissory damages."); see also Ambac, 2016 WL 7374210, at *14 ("The First Department has held that where, as here, a monoline insurer has voluntarily given up the right to rescission by issuing an irrevocable policy, rescissory damages are unavailable as a matter of law"); Fin. Guar., 2017 WL 593142, at *4 (same). This conclusion also is consistent with the well settled rule that "[a]n insurer's failure to rescind a policy promptly after obtaining sufficient knowledge of alleged misrepresentations by an insured constitutes ratification of the policy." U.S. Life Ins. Co. in City of NY v Blumenfeld, 92 AD3d 487, 488 (1st Dept 2012). An insurance company that continues to accept premium payments, as MBIA did here, is absolutely barred from seeking rescissory damages. See Bible v. John Hancock Mut. Life Ins. Co. of Boston, Mass., 256 NY 458, 462 (1931); U.S. Life Ins. Co. v Grunhut, 83 AD3d 528, 529 (1st Dept 2011); Sec. Mut. Life Ins. Co. of NY v Rodriguez, 65 AD3d 1, 7 (1st Dept 2009). 
G. Duplication of Damages
The result of the court's loss causation ruling is that the entirety of MBIA's fraud claim must be dismissed due to duplicative damages. Credit Suisse contends that since MBIA is not entitled to recover damages attributable to conforming loans and is not entitled to rescissory damages (under Countrywide II and due to its continued acceptance of insurance premiums), the only possible damages that MBIA could recover on its fraud claim are damages attributable to non-conforming loans (i.e., claim payments attributable to non-conformance). These "out-of-pocket" damages are precisely what a fraud plaintiff is ordinarily entitled to recover under New York law. See Connaughton v Chipotle Mexican Grill, Inc., 135 AD3d 535, 538 (1st Dept 2016) ("When a claim sounds in fraud, the measure of damages is governed by the 'out-of-pocket' rule, which states that the measure of damages is 'indemnity for the actual pecuniary loss sustained as the direct result of the wrong.'"), quoting Lama Holding Co. v Smith Barney Inc., 88 NY2d 413, 421 (1996); Bank Hapoalim, 121 AD3d at 535, citing Starr Found. v Am. Int'l Group, Inc., [*21]76 AD3d 25, 27-28 (1st Dept 2010); see also AHW Inv. P'ship, MFS, Inc. v Citigroup Inc., 661 FedAppx 2, 4 (2d Cir 2016) ("the true measure of damages for fraud is indemnity for the actual pecuniary loss sustained as the direct result of the wrong.") (emphasis added),[FN34]
 quoting Starr, 76 AD3d at 27-28. Consequently, Credit Suisse argues that MBIA's fraud claim must be dismissed because the only recoverable damages are entirely duplicative of what it would recover on its contractual put-back claims. Credit Suisse is correct.
Contrary to MBIA's contentions, it is well settled law in the First Department that when a fraud claim would only entitle the plaintiff to the very same damages that are recoverable on its breach of contract claim, the claim should be dismissed as duplicative. See Laurel Hill Advisory Group, LLC v Am. Stock Transfer & Trust Co., 112 AD3d 486, 487 (1st Dept 2013) ("The fraud alleged is based on the same facts that underlie the contract counterclaim, is not collateral to the contract and does not call for damages that would not be recoverable under a contract theory.") (emphasis added), citing J.E. Morgan Knitting Mills, Inc. v Reeves Bros., Inc., 243 AD2d 422, 423 (1st Dept 1997).
The First Department articulated the rationale for this rule in Mañas v VMS Assocs., LLC, 53 AD3d 451 (1st Dept 2008), where, after concluding that the fraud claim was improperly premised on general allegations of the defendant's intention not to perform under the contract, the court explained:

Additionally, the fraud-based causes of action must be dismissed for another, independent reason. Causes of action for breach of contract and fraud based on the breach of a duty separate from the breach of the contract are designed to provide remedies for different species of damages: the damages recoverable for a breach of contract are meant "to place the nonbreaching party in as good a position as it would have been had the contract been performed" [Brushton-Moira Cent. School Dist. v Thomas Assoc., 91 NY2d 256, 261 (1998)]; the damages recoverable for being fraudulently induced to enter a contract are meant to "indemnify for the loss suffered through that inducement" [Deerfield Commc'ns Corp. v Chesebrough-Ponds, Inc., 68 NY2d 954, 956 (1986) (internal quotation marks and brackets omitted)], e.g., damages for foregone opportunities [see Coppola v Applied Elec. Corp., 288 AD2d 41, 42 (1st Dept 2001)]. Here, plaintiff did not allege that she sustained any damages that would not be recoverable under her breach of contract cause of action; she seeks to recover salary and bonuses to which she claims she is entitled under the short and long-term compensation plans. Thus, the fraud-based causes of action are duplicative of the breach of contract cause of action.
Id. at 454 (emphasis added); see also Triad Int'l Corp. v Cameron Indus., Inc., 122 AD3d 531, 531-32 (1st Dept 2014). This reasoning is consistent with Court of Appeals precedent. See Deerfield, 68 NY2d at 956.
Here, the only damages MBIA could recover on its fraud claim are those resulting from non-conforming loans. Those are precisely the damages MBIA is entitled to recover on its [*22]breach of contract claim. MBIA's alleged fraud damages, therefore, are duplicative. This warrants dismissal of the fraud claim.[FN35]

While a trial is needed to determine the Transaction's non-conformance rate, there is no question that, in the event losses attributable to non-conforming loans do not suffice to make MBIA whole, MBIA will not be made whole. That would be so because it agreed to insure market risk on conforming loans, and as the market imploded, such risk manifested.
Finally, there is no merit in MBIA's contention that the theoretical availability of punitive damages suffices to establish that the fraud damages are not duplicative of the contact damages. On the contrary, the possibility of punitive damages is not a basis to maintain an otherwise duplicative fraud claim. See Mosaic Caribe, 117 AD3d at 422-23 ("apart from an unelaborated request for punitive damages in connection with the fraud claim, the proposed amended complaint seeks the same damages as the breach of contract claim."), citing Krantz v Chateau Stores of Canada Ltd., 256 AD2d 186, 187 (1st Dept 1998).
For these reasons, summary judgment is granted to Credit Suisse on MBIA's fraud claim, [*23]which is dismissed with prejudice on the ground that the only available damages are entirely duplicative of the damages available on MBIA's contractual put-back claims.[FN36]
 The contract claims shall proceed to trial. Accordingly, it is
ORDERED that (1) MBIA is granted partial summary judgment on its proffered meaning of the MLS and No-Default Warranties and on the fact that the non-stated income Unrebutted Loans breached the warranties set forth in MBIA's expert report; (2) Credit Suisse is granted summary judgment on MBIA's fraudulent inducement claim, which is hereby dismissed with prejudice; and (3) the parties' summary judgment motions are otherwise denied; and it is further 
ORDERED that MBIA's motion to supplement the summary judgment record is denied; and it is further
ORDERED that the parties shall jointly contact the court within 14 days of the entry of this order on NYSCEF to discuss their intentions to seek interlocutory appeal of this decision and their desire to proceed to trial while such an appeal is pending.
Dated: March 31, 2017
Hon. Shirley Werner Kornreich
J.S.C.



Footnotes

Footnote 1: MBIA's claims against defendant Select Portfolio Servicing, Inc. (SPS) were discontinued without prejudice by stipulation so-ordered on May 29, 2016. See Dkt. 925. References to "Dkt." followed by a number refer to documents filed in this action on the New York State Courts Electronic Filing (NYSCEF) system. 

Footnote 2: General familiarity with RMBS transactions is assumed. See FHFA v Nomura Holding Am., Inc., 104 FSupp3d 441, 462-64 (SDNY 2015) (Cote, J.) (providing "Overview of the Securitization Process"). 


Footnote 3: "The [Transaction] consisted of 15,615 closed-end second lien residential mortgage loans with an aggregated outstanding principal balance as of the cut-off date of approximately $899,999,169." See Dkt. 849 at 20-21. "According to the loan tape sent on April 25, 2007, which contained information about 15,615 loans, the majority of loans securitized in [the Transaction] were closed in 2006 (13,209 loans) and 2007 (2,272 loans)." See id.

Footnote 4: The final paragraph of section 2.03(e) further provides: "The representations and warranties made pursuant to this Section 2.03 shall survive delivery of the respective Mortgage Files to the Trustee for the benefit of the Certificateholders and [MBIA]." See Dkt. 857 at 89 (emphasis added).


Footnote 5: The PSA contains both loan-level and transaction-level warranties.


Footnote 6: Even if the sole remedy clause did not apply to MBIA, the damages available to MBIA would still be limited to those related to non-conforming loans. As discussed herein, MBIA cannot recover the portion of its claims attributable to conforming loan losses, a risk it insured.

Footnote 7: This court's holdings in Assured (which were never appealed because the case settled) are of significant import, especially with respect to Insurance Law §§ 3105 and 3106 and loss causation. Those holdings are discussed below. As further discussed herein, the court's prophylactic provision holding in Assured is not the basis of the instant decision.


Footnote 8: The core causes of action in the AC are the same as those in the original complaint [see Dkt. 2 at 32-38 (eight original causes of action)], but are based on new factual allegations proffered by what were then confidential witnesses. The context of the AC was discussed in the court's October 3, 2013 order (Dkt. 587), which also notes the extensive discovery disputes in this seven-year-old case. The history of the parties' discovery disputes is not relevant to the instant motions and is not discussed.


Footnote 9: The fraud claim would have been tried by a jury. The contract claims, by virtue of a jury waiver, will be tried by the court. See MBIA Ins. Corp. v Credit Suisse Secs. (USA), LLC, 102 AD3d 488 (1st Dept 2013).


Footnote 10: Unless otherwise indicated, the facts recited herein are undisputed and are based on the parties' joint statement, the exhibits attached thereto, and other documents filed in this action of which the court takes judicial notice.

Footnote 11: Notably, the two cases cited by Credit Suisse that are not in line with this consensus are not among the New York federal and state court RMBS decisions issued since 2008. See Dkt. 1044 at 21. While Credit Suisse may disagree with the current consensus, it cannot credibly contend that no consensus exists.

Footnote 12: The Countrywide III court explained:
As the parties are aware, [the] finding that [a] representation was inaccurate is not the end of the analysis. To grant summary judgment as to breach, the parties argue that the Court must next find that the inaccuracy "materially and adversely affected" MBIA's interest in the loan. However, the [court] already found that this "materially and adversely affected" language is ambiguous and denied MBIA's earlier motion for partial summary judgment. Here, it appears that MBIA seeks to have this Court apply a definition of material and adverse [] that the Court already concluded it could not do as a matter of law. Since the instant motion neither addresses nor resolves this ambiguity, the Court sees no reason to revisit this particular ruling. Thus, the Court cannot conclude based on the record before it that these inaccuracies satisfy the "materially and adversely affect" standard, and therefore are breaches.
Countrywide III, 39 Misc 3d 1220(A), at *28-29 (citations and paragraph breaks omitted).


Footnote 13: Whether this is a good rule (especially where, as here, the case will be tried by the court instead of a jury) is debatable. Notably, under Delaware law, on summary judgment (but not on a motion to dismiss) [see VLIW Tech., LLC v Hewlett-Packard Co., 840 A2d 606, 615 (Del 2003)], the court may decide the meaning of a contract by selecting the superior interpretation without resort to extrinsic evidence. See i/mx Info. Mgmt. Solutions, Inc. v Multiplan, Inc., 2014 WL 1255944, at *5 (Del Ch 2014). However, under New York law, the First Department has explained:
While it is not this Court's preference to find a triable issue of fact concerning the terms of a written agreement between two sophisticated contracting parties, [its] options are limited where the contractual provisions at issue are drafted in a manner that fail to eliminate significant ambiguities and the only extrinsic evidence offered is each party's self-serving statements regarding its own understanding of the agreement. 
NFL, 51 AD3d at 61. 

Footnote 14: The requisite inquiry into intent may differ between the Insurance Agreement and the PSA, as MBIA is only a party to the former. MBIA's involvement in the drafting of the PSA, and the intent of the PSA's actual drafting participants, may be probed at trial. While MBIA indisputably has standing to enforce the PSA, it is unclear if its own intent is relevant.


Footnote 15: MBIA, misguidedly, emphasizes the fact that Credit Suisse has not proffered its own independent reunderwriting or disproved MBIA's claims of non-conformance. That is not something Credit Suisse has an independent obligation to do. As Credit Suisse pointed out at oral argument and in its opposition brief, and as noted earlier, MBIA essentially ignored this issue in its moving brief. While MBIA tersely mentioned the issue in its reply brief, the court will not consider arguments made for the first time in reply. See PK Rest., LLC v Lifshutz, 138 AD3d 434, 438 (1st Dept 2016). Nor can MBIA claim surprise that Credit Suisse raised the issue in its opposition brief since, as Credit Suisse correctly noted at oral argument, the meaning of material and adverse was extensively addressed at the pre-motion conference. It also should be noted that, as the UBS decision should make clear, even if the court were to adopt the risk of loss interpretation, what that interpretation means, as applied to each particular warranty, is a separate inquiry. Hence, even if the court granted summary judgment to MBIA on its risk of loss interpretation, summary judgment on the Unrebutted Loans would still be denied because MBIA did not specifically establish what the risk of loss standard means within the context of the breaches at issue on the Unrebutted Loans (nor did MBIA sufficiently address the issue, discussed in UBS, of when materiality is determined, e.g., the date of the repurchase demand or the date the warranties were made). As with the risk of loss theory itself, the question of what it means for a breach to non-nominally increase the risk of loss (e.g., the percentage the loan-to-value ratio deviated from the permitted ratio for such deviation to be considered material) was discussed extensively at the pre-motion conference. Simply put, MBIA cannot credibly express surprise that summary judgment is denied after failing to address issues the court made clear are of extreme importance. 

Footnote 16: Credit Suisse notes that "[f]or 43 of those loans [with Missing Guidelines], Credit Suisse produced part of the applicable guidelines—either a guideline document or matrix, but not both—and for only 13 loans, the specific guideline and matrix document are both missing." See Dkt. 1044 at 24. It, therefore, is far from clear that MBIA actually lacks sufficient evidence to prove that the affected loans did not conform to their applicable guidelines. The 13 loans for which no guideline and matrix document has been produced should, as noted below, be addressed by the parties' motions in limine. 

Footnote 17: MBIA notes that "[t]here is an overlap of four loans between the [U]nrebutted [L]oans and the missing guidelines loans." See Dkt. 930 at 22. 

Footnote 18: In virtually all commercial contract cases, the defendant will possess documents necessary for the plaintiff to prove its claim. By MBIA's logic, failure to maintain documents is not merely an issue of spoliation, but a breach of the implied covenant. MBIA does not cite any authority for this proposition. In this court's view, a party should not be able to seek what effectively is a spoliation sanction by virtue of an independent cause of action, whose elements may differ from the spoliation standard. See Pegasus Aviation I, Inc. v Varig Logistica S.A., 26 NY3d 543, 547 (2015) (addressing spoliation standard).


Footnote 19: To be sure, even if the Missing Guidelines should give rise to an implied covenant claim, MBIA would not automatically prevail by default. At best, MBIA would be entitled to a ruling that the affected loans did not comply with their applicable underwriting guidelines. MBIA, however, would still have to prove the material and adverse prong. For this reason, even if the court agreed with MBIA's implied covenant theory, summary judgment would still be denied. 

Footnote 20: To be clear, the court is not ruling on the method of proof that may be used to demonstrate a loan's non-compliance with the Missing Guidelines. That is a matter of trial strategy.


Footnote 21: "Cut-off Date" is defined as April 1, 2007. See Dkt. 857 at 30.


Footnote 22: For instance:
The ProSupp states that 3,187 loans, or 16.27% of the aggregate outstanding principal balance, were originated under a "Full/Alt" documentation program; 755 loans, 4.26% of the aggregate outstanding principal balance, were originated under a "NINA" documentation program; 10,152 loans, or 69.41% of the aggregate outstanding principal balance were originated under a "Reduced" documentation program; and 1,521 loans, or 10.06% of the aggregate outstanding principal balance, were originated under a "Stated/Stated" documentation program.
See Dkt. 849 at 11.

Footnote 23: Credit Suisse notes that, in connection with a discovery motion in 2012, this court remarked that Credit Suisse's interpretation makes sense. See Dkt. 1024 (5/24/12 Tr. at 3). However, subsequently, in more formally deciding a motion to dismiss in WMC, this court concluded otherwise. The Appellate Division and Court of Appeals agreed. To the extent Credit Suisse invokes the so-called "law of the case" doctrine, that doctrine would be inapplicable where, as here, there is binding on-point appellate precedent. 

Footnote 24: The court recognizes that Vice Chancellor Laster came to a different conclusion, both with respect to an MLS Warranty and a No Default Warranty. See Bear Stearns Mort. Funding Trust 2007-AR2 v EMC Mort. LLC, 2014 WL 2469668, at *2-3 (Del Ch 2014). While this court respectfully disagrees with his analysis, it bears mentioning that the Vice Chancellor, relying on the fact that in Delaware "[t]here is no 'right' to a summary judgment," thought it more prudent to rule on the issue after trial. See id. at *2 ("When confronted with a [summary judgment] motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application."). The trial will be complicated enough; trying issues amenable to summary judgement is, especially in a case such as this, something to be avoided.


Footnote 25: The meaning of the MLS Warranty and the No Default Warranty are the subject of MBIA's summary judgment motion, but are also implicated by Credit Suisse's motion as well. Credit Suisse argues that the warranties in the PSA should not be construed in a manner that effectively makes them a no-fraud rep. See Dkt. 994 at 45-46. Summary judgment is denied on this issue. To the extent this prong of Credit Suisse's motion specifically seeks summary judgment on the MLS Warranty and the No Default Warranty, summary judgment is denied because the court has ruled in MBIA's favor on their meaning. To the extent Credit Suisse seeks summary judgment on the fact that other unspecified warranties may also implicate borrower fraud, summary judgment is denied. The court will not opine, hypothetically, on the manner in which other of the myriad warranties in the PSA should be interpreted to reflect the parties' agreed upon risk allocation. While it is undisputed that the PSA does not contain a classic, explicit no-fraud rep, proffering that fact is not a sufficient basis to seek interpretive summary judgment on warranties not specially addressed in Credit Suisse's brief. To be sure, it is not clear if this is indeed what Credit Suisse is seeking, but to the extent it is, that portion of its motion is denied.

Footnote 26: The court's view of the applicable First Department monoline fraud precedent is that, at best, a dismissal on reasonable reliance grounds could only be accomplished after a trial, likely with the aid of expert testimony. While motions to dismiss (let alone summary judgment) have been granted for lack of due diligence in similar cases outside of the RMBS context, the First Department appears to have drawn a line in the sand that monolines' failure to conduct loan level due diligence may not, as a matter of law, defeat their fraud claims. This court will not push back against that line given the other bases for dismissal. 

Footnote 27: The First Department also addressed rescissory damages, an issue discussed further herein. It should be noted that the court assumes, arguendo, that Credit Suisse qualifies as an "applicant for insurance." See CIFG Assur. N. Am., Inc. v J.P. Morgan Sec. LLC, 146 AD3d 60, 65-66 (1st Dept 2016); see also J.P. Morgan, 144 AD3d at 639 ("the proposed amended complaint alleged that the defendant "was an applicant for insurance" and that the defendant "serve[d] as an intermediary between [the plaintiff] and the other parties."). Of course, neither party in this case can plausibly claim to be the "prospective insured"; the insured would either be the RMBS trust or the certificateholders.

Footnote 28: The Second Department, in describing MBIA's claims, stated that MBIA alleged that "defendant made material misstatements in connection with an application for insurance, which misstatements were actionable irrespective of actual reliance pursuant to Insurance Law § 3105." See J.P. Morgan, 144 AD3d at 636. Whether this was actually a holding, or merely a description of MBIA's argument, is an issue this court need not reach. It also bears mentioning that Justice Scheinkman, in a portion of a prior decision not reversed by the Second Department (the issue he was reversed on was whether there is an independent cause of action under § 3105, not whether § 3105 should inform the common law standard), appears to have taken the position that the only common law element affected by § 3105 is materiality. See MBIA Ins. Corp. v J.P. Morgan Secs. LLC, 45 Misc 3d 1202(A), at *11 (Sup Ct, Westchester County 2014) (While it may be that this language [in § 3105] alters or varies the common law definition of materiality, materiality of the misrepresentation being an element of the common law cause of action, there is nothing in this language that alters the common law rule that a misrepresentation must be relied upon in order to be actionable.") (emphasis added).

Footnote 29: Justice Friedman recently analyzed Countrywide I and Countrywide IV, and made similar observations after noting the tension between the lack of a requirement to prove the element of loss causation and the requirement that damages be related to non-conformance. See Ambac Assur. Corp. v Countrywide Home Loans, Inc., 54 Misc 3d 1215(A), 2016 WL 7374210, at *16-18 (Sup Ct, NY County Dec. 19, 2016) (Ambac); see also Fin. Guar. Ins. Co. v Morgan Stanley ABS Capital I Inc., 54 Misc 3d 1215(A), 2017 WL 593142, at *6-8 (Sup Ct, NY County Jan. 19, 2017). Citing this court's decision in Assured, Justice Friedman wrote that "[i]t appears that the [Countrywide I and Countrywide IV] courtalbeit, without using the terminologyapplied the concept of loss causation to proof of damages of a common law fraud claim 'informed by' Insurance Law § 3105." See Ambac, 2016 WL 7374210, at *18 (emphasis added). It should be noted that Ambac was a decision on a motion to dismiss, not, as here, a summary judgment decision rendered with the benefit of an extensive discovery record. Ambac indicated that the inquiry might be different after discovery. See id. at *12-13; see also Fin. Guar., 2017 WL 593142, at *8. 

Footnote 30: § 3105(b)(2) is not applicable because it addresses medical policies. 

Footnote 31: It does not matter that the misrepresentations at issue in this case are, as noted earlier, contained in the governing contract's warranties, since the First Department has held that one may sue on a seemingly duplicative fraud claim based on the very warranty at issue on the breach of contract claim. See Wyle Inc. v ITT Corp., 130 AD3d 438, 440 (1st Dept 2015) ("a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim.)." That type of duplication, as opposed to the duplication of damages, is not at issue.


Footnote 32: MBIA appears to suggest [see Dkt. 930 at 39] that the risk of loss standard in § 3106 warrants summary judgment on its interpretation of "material and adverse". While the standard under § 3106 only reinforces the court's inclination to agree with MBIA's risk of loss theory, principles of freedom of contract preclude the court from deciding this issue on summary judgment. The court views § 3106 as the default rule. The parties do not argue, nor is there reason to believe, that sophisticated insurance companies and banks, such as MBIA and Credit Suisse, are powerless to contract for a different standard to apply to their warranties. See J.P. Morgan Secs. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334 (2013) ("Freedom of contract is deeply rooted in public policy. As a result, parties to an insurance arrangement may generally "contract as they wish and the courts will enforce their agreements without passing on the substance of them.") (internal citations and quotation marks omitted), citing Slayko v Security Mut. Ins. Co., 98 NY2d 289, 295 (2002) (courts "are reluctant to inhibit freedom of contract by finding insurance policy clauses violative of public policy"). While freedom of contract is "fundamental in New York law," it "is not absolute"; nonetheless, the parties do not contend that public policy prohibits them from agreeing to a "material and adverse" standard that is different from the standard in § 3106. See Deutsche Bank Nat'l Trust Co. v Flagstar Capital Markets Corp., 143 AD3d 15, 20 (1st Dept 2016). The parties could have, but did not, use the exact risk of loss causation formulation set forth in § 3106. While this risk of loss standard may well have been what the parties' intended the words "material and adverse" to mean, that is a question of fact for trial.

Footnote 33: As noted earlier, the Court in ACA disagreed with the First Department's "prophylactic provision" ruling. See ACA, 25 NY3d at 1045 ("our holding in [Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 17 NY3d 269 (2011)] does not impose a duty on plaintiffs to insist on a 'prophylactic provision' in agreements."). Perhaps recognizing ACA's applicability, the parties do not (nor does the court) rely on this court's prophylactic provision ruling in Assured, which relied on the now-reversed First Department decision in ACA. See Assured, 44 Misc 3d 1206(A), at *4-5, citing ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 106 AD3d 494, 495-96 (1st Dept 2013). Arguably, this case may fall somewhere in between Centro and ACA, but the court will not opine on that issue since the parties do not seek summary judgment based on the prophylactic provision rule.

Footnote 34: AHW explained that other jurisdictions have "adopted two standards for the measurement of damages in an action for fraudulent representation, including not only an "out-of-pocket' rule,' like New York's, but also a 'benefit of the bargain'" rule. See id. at 4 (citation omitted). New York, however, exclusively applies the out-of-pocket rule. 

Footnote 35: To be sure, in this case, unlike many other RMBS cases, MBIA alleges certain fraud that is not entirely identical to its warranty breach claims or general claims of shoddy underwriting practices, such as alleged lies about Credit Suisse's organizational structure. For instance, MBIA alleges and has submitted proof that Credit Suisse doctored portions of some of the reunderwriting spreadsheets that would have revealed warranty breaches that, perhaps, may have given MBIA pause about insuring the Transaction. While this is not the first time a bank is alleged to have engaged in this sort of malfeasance, it is far from clear that this would have affected MBIA's decision making process. See MBIA Ins. Corp. v J.P. Morgan Secs. LLC, 2016 WL 4141573, at *1 (Sup Ct, Westchester County 2016) ("Efforts were made [by] Bear Stearns, to address the problems but ultimately, with the closing just hours away, [Bear Stearns] altered the spreadsheets that MDMC had sent him, and these altered spreadsheets were sent by Bear Stears to MBIA. Unfortunately for MBIA, its personnel did not read or review the altered spreadsheets prior to closing. The Court granted MBIA summary judgment on its actual fraud claim, ruling that there was no evidence that anyone at MBIA as much as glanced at the content of the spreadsheets and that no one at MBIA actually relied on the spreadsheets or the e-mail that accompanied them.") (emphasis added). Regardless, even if non-conformance was concealed from MBIA, the resulting losses would still be recoverable by virtue of MBIA's put-back remedy. The harm MBIA suffered was exposure to loans that, under the PSA, were not legally permitted to be included in the Transaction. Any loan in the Transaction that was eligible for inclusion under the PSA by virtue of its conformance with the applicable reps and warranties did not cause any harm to MBIA that MBIA did not agree to assume (e.g., market risk on conforming loans). In other words, the harm to MBIA, even by virtue of the alleged doctoring by Credit Suisse of the conclusions of its underwriting consultant, is the same as it suffered by virtue of the Transaction containing non-conforming loans. The lie, simply put, was about the propriety of the loans in the Transaction. Since the harm caused by that species of lie is the same as that suffered by virtue of the contractual warranties being violated, the damages are one and the same. Given the required nexus between Credit Suisse's fraud and non-conformance, any damages resulting from organizational structure lies and spreadsheet doctoring would necessarily be recoverable on MBIA's breach of contract claim.

Footnote 36: In light of the court's grounds for dismissing MBIA's fraud claim, MBIA's request to supplement the summary judgment record is denied. MBIA avers that Credit Suisse's settlement with DOJ [see Dkt. 1201] is relevant to its reasonable reliance and punitive damages request [see Dkt. 1204 at 2], but those issues are not germane to this decision. As discussed, the court does not reach the issue of reasonable reliance and holds that the possible availability of punitive damages cannot, on its own, save MBIA's fraud claim from dismissal. The ways in which the settlement might shed light on these issues are immaterial, and thus there is no need to supplement the record.